Arthur (Dick) RICHARDS, Plaintiff,

v.

COLUMBIA BROADCASTING SYSTEM, Inc., a corporation, Defendant.

Civ. A. No. 2052-56.

United States District Court
District of Columbia.

April 16, 1958.

Manuel C. Avancena, Washington, D. C., for plaintiff.

Percy A. Shay, and Sidney H. Willner, Washington, D. C., for defendant.

SIRICA, District Judge.

This is a civil action brought by the plaintiff, Arthur (Dick) Richards, under Title 17 U.S.C. § 101, for an injunction and for damages arising out of an alleged infringement of plaintiff's copyrighted script entitled "Name the Star".

Plaintiff alleges in his complaint that he wrote the script prior to 1940 and obtained a copyright some time thereafter in accordance with the copyright laws; and that since June 9, 1948, plaintiff has been, and still is, the sole proprietor of all rights, title and interest in the copyrights to the manuscript. He also contends that he mailed copies of his script to parties likely to be interested in the broadcasting of quiz programs including the defendant.

Plaintiff further alleges that during the Summer season of 1953 defendant televised a quiz program entitled "Bank on the Stars". He contends that this program infringed his copyright on his original script entitled "Name the Star".

When the case came on for pre-trial proceedings, the defendant requested further specification of the alleged similarities between defendant's program and plaintiff's script and the court ordered plaintiff to furnish this material. Defendant, despite plaintiff's efforts, maintained that the plaintiff's contentions were still too vague and moved to dismiss the case for plaintiff's failure to comply with the court's order. The court, however, declined to rule on this issue and instead set the case for hearing on defendant's motion for summary judgment so that the merits of the case could more thoroughly be considered. Defendant filed additional affidavits and, at the hearing, plaintiff testified at length and submitted documentary evidence in support of his theory of the case. At the conclusion of that same hearing, counsel on both sides as well as the plaintiff represented to the court that they had introduced substantially all of the evidence they had intended to introduce at the trial except for a kinescope showing of the defendant's telecast of "Bank on the Stars".

A copyright grants an author the exclusive right of multiplying copies of what he has written or printed. Perris v. Hexamer, 1879, 99 U.S. 674, 25 L. Ed. 308. The elements to be proven in an action for copyright infringement were recently summarized in Costello v. Loew's Incorporated, D.C.D.C., 159 F. Supp. 782, as follows:

"It is agreed that to recover for either copyright infringement or common-law misappropriation of literary property the plaintiff must prove (1) access; (2) substantial similarities between the two works; and (3) copying of the plaintiff's work by the defendant."

In his testimony and deposition, plaintiff stated that he had properly complied with the copyright laws as to registration and notice and that he had mailed a copy to defendant's Program Director in 1940. In their affidavits the originators of the script for "Bank on the Stars" deny having had access to plaintiff's script at any time. However, the Court will construe this allegation of access in favor of the plaintiff and, for the purposes of this motion, assume it to be true.

Copying involves the use of an original work so as to produce a work

"so near to the original as to give to every person seeing it the idea created by the original". Cf. White-Smith Music Pub. Co. v. Appollo Co., 1908, 209 U.S. 1, 17, 28 S.Ct. 319, 323, 52 L.Ed. 655. Furthermore, as Judge Keech pointed out in the Costello case, above:

" * * * Copying may be inferred where there has been access and the similarities between the two works are such as to raise a reasonable inference of copying; but the similarity must be recognizable on ordinary observation and the test is not 'whether by some hypercritical dissection of sentences and incidents seeming similarities are shown to exist.' "

Thus, it is upon the issue of substantial similarity that the decision of defendant's motion for summary judgment must be based. This similarity is not one of ideas as such, but of the embodiment of these ideas in written or other form since an author cannot obtain a copyright on his ideas apart from their expression. Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 121, certiorari denied 1931, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795. The fundamental idea of an original work may even be borrowed as long as the specific details of the author's literary efforts are not copied. Echevarria v. Warner Bros. Pictures, D.C.S.D.Cal. 1935, 12 F.Supp. 632.

As between plaintiff's and defendant's scripts, many of the words are the same because they are both quiz programs about movies, but the style and arrangement of the words would present no substantial similarity to the ordinary observer. With respect to radio and television broadcasts, it is perhaps more significant to compare in detail the sequence of episodes which taken together make up the program as a whole and which form the concrete manner of expressing the basic "idea" of a quiz based on motion pictures. The method is similar when there is a comparison of stage-plays. As Judge Learned Hand stated in Nichols v. Universal Pictures Corp., supra, 45 F.2d at page 121:

" * * * Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. * * * In such cases we are rather concerned with the line between expression and what is expressed. As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance."

To illustrate the relationship between these two programs, the Court has prepared a comparative analysis of both scripts as an appendix to this opinion. As the comparison shows, both programs contain an introduction, a description of the contest, a conversational interview with each contestant, the asking of questions relating to motion pictures, a final "jackpot" type of question, and a conclusion. It can hardly be claimed from these broad similarities that defendant has copied plaintiff's script. These features would almost inevitably occur in any quiz program on motion pictures. The mere idea alone of basing a quiz program on motion pictures, even if it were original, would not be subject to protection under the copyright laws.

Several important differences between the two scripts should be noted. In the plaintiff's script, audience participation plays a large part in the format of the program; the radio audience has a chance to send in questions based on their favorite scenes from movies already released to the public. No such feature occurs in the CBS broadcast. On the contrary, the affidavit of Mr.

Reddy points out that the films used by CBS were new ones not yet released. Furthermore, the nature of the basic contest differs. In plaintiff's script, the object of the game is to test the contestant's memory of movies and stars they have seen. The CBS program involves what is fundamentally an observation test—a test of the contestant's sharpness of perception and ability to note and remember details of costume, or of scenery, or of background (e. g. number on an airplane), as they appear in a scene from a film whose title and leading performers are made known to the contestant beforehand. At the climax of the plaintiff's program, contestants are called upon to name the "Mystery Movie" based on the sound effects given at the outset of the program. The CBS script, on the other hand, plays the sound track from an unreleased movie containing the voice of a screen personality and asks for the identity of that personality as a means of winning the "Bank Night Bonus".

From these comparisons and from all the testimony and affidavits now in the record, it seems quite clear to the court that these two programs are basically dissimilar expressions in the broadcasting medium of the broad idea of a "quiz based on motion pictures". Construing the evidence in its most favorable light to the plaintiff, it is the finding of the court that, as a matter of law, there is no substantial similarity at all between the plaintiff's script and the defendant's program. Even assuming the truth of plaintiff's allegations of access and copying, there is no cause of action for infringement here because the resulting product broadcast by CBS is not substantially imitative of plaintiff's work and does not come so near to it as to give every person seeing it the ideas expressed by plaintiff in his script called "Name the Star".

For the reasons heretofore stated, defendant's motion for a summary judgment is granted. Prepare appropriate order.

## Appendix

### Comparison of Programs

| Defendant's TV script | Plaintiff's Radio script |
| --- | --- |
| "Bank on the Stars" | "Name the Star" |

### Introduction

| | |
| --- | --- |
| Anncr: introduces "Bank on the Stars" with musical fanfare—gives titles of several outstanding motion pictures to be featured on the show (each with musical highlight)—then introduces the MC. | Anncr: after fanfare, gives name of show as "Name the Star" and introduces the MC. |
| | MC: (1) Tells listeners how to win prizes by submitting best verbal description of favorite movie scene of the past for use on the show. |
| | (2) By means of sound effects, clues are given to identity of "Mystery Movie" which contestants will be asked to name at end of show. |

## Body of Program

MC:

(1) "Ad lib" interview with pair of contestants

(1) Suggested form of dialogue with one contestant.

(2) Rules of contest given

(2) Rules of contest given.

(3) Climactic scene from a motion picture is shown to contestants then the name of the movie and of the leading stars are revealed.

(3) With background music, reads to the contestant a description of a famous movie scene sent in by radio audience.

(4) (a) The game is played (contestants tested as to ability to recall details of scene such as dress, background, etc.)

(4) (a) Contestant asked to name the picture and "Name the Star".

(b) If a wrong answer given, a "pound of money" given to contestants.

(b) After a wrong answer, sound track excerpts are played to give further clues. If contestant still unable to answer, he is given $00.00 for being contestant.

## Highlight of Show

MC:

Winning contestants given chance to win "Bank Night Bonus". The audience sees the film scene from a new picture with a well known star while the contestants hear only the sound of star's voice and are asked to identify the star.

Contestants called upon to give the name of the "Mystery Movie". If no right answers, the sound effects are repeated and an additional clue is given.

## Conclusion

MC:

All un-won prize money from "Bank Night Bonus" added on to prize for next "Bank Night".

Sign-off to commercial with reminder to listeners to send in question entries.